NORTON HEALTHCARE,
INC., Appellant

v.

Lual A. DENG (formerly Jacob
L. Aker), Appellee

2013–SC–000526–DG

Supreme Court of Kentucky.

RENDERED: FEBRUARY 18, 2016

COUNSEL FOR APPELLANT: Alina Klimkina, Donna King Perry, Jeremy Stuart Rogers, Dinsmore & Shohl, LLP

COUNSEL FOR APPELLEE: Everett Clay Hoffman, Priddy, Cutler, Naake & Meade, PLLC

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

In cases where the employee must show that he applied for the position in question in order to establish a prima facie claim for employment discrimination, some courts have applied the futile-gesture doctrine to excuse this application requirement if the employee can show that the employer's consistently enforced discriminatory policy made applying for the position a pointless exercise. The Court of Appeals cited the futile-gesture doctrine to rescue Lual A. Deng's (Aker) post-termination retaliation claim from summary judgment granted by the trial court in favor of his former employer, Norton Healthcare, Inc. On discretionary review, we reverse that decision by the Court of Appeals and reinstate the trial court's summary judgment because the Court of Appeals overreached by injecting the futile-doctrine theory on it's own motion and trial court did not err in granting summary judgment to Norton as a matter of law.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Aker is a Sudanese immigrant first hired by Norton in 2002 as a linen clerk. Over the course of the next four years, he rose through the Norton system and was promoted to Personal Care Assistant in 2006. In this capacity, conflicts emerged between Aker and Gloria Pescador, his assigned floor nurse—some of which allegedly escalated to include racial and ethnic barbs directed at Aker.

This tension reached a boiling point in August 2007, when following another confrontation with Pescador, Aker complained to his supervising nurse, Jean Paulraj, about his work environment. During this conversation, and over interruption from Pescador, Aker allegedly told Paulraj that if Pescador did not change the way she spoke to him, then "something else" would happen.[1] This was perceived as a threat, and the matter was directed to Nurse Manager Karen Higdon. Higdon then commenced an investigation with Norton's Human Resources department. During this period, Aker was placed on administrative leave. Higdon ultimately concluded that Aker's tone and statements were physical threats to harm Pescador and determined that this constituted a Level I offense. Under Norton's procedures, the punishment for a Level I offense is immediate termination.

Aker appealed this decision to Norton's Grievance Resolution Team. After interviewing Aker and the other parties involved in the incident, the Grievance Resolution Team reversed Higdon's decision, finding that Aker's actions were more properly classified as a Level II offense. This was primarily because the team could not conclusively determine that Aker's statements posed an immediate threat of physical harm to Pescador. Higdon accepted the decision and opted not to use the additional internal appellate procedures within the Norton system to reinstate her original Level I classification.

Instead of immediate termination, the Grievance Resolution Team recommended that Aker participate in Norton's Employee Assistance Program counseling, and he was permitted to seek another position in a different Norton unit or location. Norton placed him on administrative leave to complete the counseling and gave him until November 28, 2007, to apply for alternate employment as an *internal* candidate. During this period, Aker met with Jason Coffey, a Norton retention manager, and applied for three open positions internally. He was not hired for any of them.

After his administrative leave expired, Aker could only apply for positions as an *external* job candidate. So after November 28, 2007, Aker's employment with Norton was effectively terminated, and he later received notification from Norton that he was no longer an employee. He never applied for any additional jobs under the Norton Healthcare umbrella.

Shortly after his termination, Aker began consulting with attorney Erwin A. Sherman, who advised Aker from December 2007 through March 2008. In late December 2007, Sherman wrote a letter to Norton Human Resources stating that Aker had waited "an inordinate amount of time" to be reinstated to return to work. This letter prompted Norton's Assistant General Counsel, Thomas E. Powell II, to respond that Aker would not be returning to work because he failed to obtain employment through Norton's retention program and that he was thus no longer a Norton employee.

---

1. It should be noted that Aker disputes ever making this statement. Instead, he claims he merely told Paulraj that she "needed to do something."

On February 27, 2008, Aker filed a pro se action in the circuit court against Norton for racial discrimination in terminating his employment. The following week, Sherman telephoned Powell, and Powell allegedly informed Sherman that Aker would not be considered for future employment with Norton after filing his pro se suit.[2] Sherman memorialized his impressions of the conversation in a letter he sent to Powell the next day.

Aker's pro se discrimination case lay dormant for the next two years, but he obtained new counsel and filed an amended complaint in February 2010, asserting claims of breach of contract, along with violations of the Kentucky Civil Rights Act. As part of his contractual claim, he contended that he was entitled to reinstatement and transfer to another department after completing the Grievance Team's recommended counseling, rather than termination. Additionally, he alleged termination of his employment in 2007 to be motivated by racial discrimination and retaliation for complaining to his supervisor—both actions arising under the Kentucky Civil Rights Act. Finally, his amended complaint claimed that Norton's continued failure to reinstate him after February 2008 was retaliation for filing his original pro se discrimination complaint. This final claim is the whole issue before us today.

In proceedings before the trial court, Aker did not claim to have applied for any position after filing his pro se complaint, rather, he argued that Norton was contractually obligated to reinstate his employment because of his compliance with the Grievance Team recommendation. The retaliation, he argued, was that Norton based its decision no longer to consider him for employment because he sued Norton in February 2008.

In January 2012, the trial court granted Norton summary judgment on all of Aker's claims. The trial court reasoned that his employment had been completely terminated at the time Powell spoke with Sherman and that Norton had no contractual obligation to rehire him. So Norton's decision not to consider him was not actionable.

Aker appealed this ruling to the Court of Appeals, which unanimously affirmed summary judgment on his KCRA discrimination claims and the first retaliation claim arising from his termination. But the appellate panel split on his post-termination retaliation claim. The panel majority first held that Kentucky Rules of Evidence (KRE) 408 did not render the contents of Sherman and Aker's telephone conversation inadmissible as part of a settlement negotiation. The panel majority distinguished the lawyers' discussion: rather than a settlement negotiation, the panel majority viewed it as Norton's declaration of its intent not to engage in settlement negotiations.

Further, despite acknowledging that Aker never applied for any position with Norton, the panel rejected Norton's argument that he failed to present a prima facie retaliation claim. Norton argued that absent any application for a position, Aker failed to show any "adverse employment action" in connection to Powell's alleged statement indicating that Norton would not be interested in hiring him. The panel majority disagreed and reversed the trial court's summary judgment by determining that the futile-gesture doc-

---

**2.** In the proceedings below, Norton disputes Aker's characterization of the contents of the conversation. But because we view the facts most favorably to the party opposing summary judgment, we assume Aker's portrayal of Powell's statement is correct.

trine excused Aker's failure to apply for a position. The majority held that, "[b]eing told by a Vice President and the General Counsel of Norton that Aker would not be considered for a position, even if he dismissed the case, is a perfect demonstration of the futility in filing an application." The dissenting judge departed from this holding and criticized the majority's reliance on an argument that had not been raised to the trial court.

Norton sought discretionary review of the appellate court's reversal summary judgment on the post-termination retaliation claim. Aker then filed a cross-motion as to the summary judgment issues that the Court of Appeals affirmed. We declined to review the issues raised by Aker's cross-motion. We granted discretionary review in order to review the panel majority's sua sponte injection of the futile-gesture doctrine, and to determine whether summary judgment on the post-termination retaliation claim was appropriately entered in favor of Norton by the trial court. Because we conclude that the Court of Appeals erroneously invoked the futile-gesture doctrine, and that Aker fails to state a prima facie retaliation claim, we reverse the decision of the Court of Appeals on this issue and reinstate the trial court's summary judgment.

## II. ANALYSIS.

The Kentucky Civil Rights Act (KCRA) was passed by the General Assembly in 1966 to place the Commonwealth on par with the Federal Civil Rights Act of 1964.[3] The general purpose of the KCRA is to "safeguard all individuals within the state from discrimination because of familial status, race, color, religion, national origin, sex, age forty (40) and over, or because of the person's status as a qualified individual with a disability." [4] Aker's claim before us today arises under the KCRA's anti-retaliation provision, designed to deter employer conspiracies to violate the statute.[5] Specifically, Aker alleges that Norton's failure to hire (or in this case, re-hire) him is a direct response to filing his pro se discrimination action in February 2008.[6]

Because of its similarity to federal civil rights legislation, anti-retaliation claims under the KCRA are reviewed consistent with claims arising under Title VII of the Federal Civil Rights Act.[7] To raise a prima facie case, a moving party must establish: (1) that the plaintiff engaged in a protected activity; (2) the defendant knew that the plaintiff engaged in that activity; (3) thereafter, defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the ad-

---

3. KRS 344.020(1). The KCRA has been routinely amended, with the stated purposes designed to also execute Title VIII of the Federal Civil Rights Act of 1968, the Fair Housing Act, the Federal Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991. *See id.*

4. *Id.*

5. KRS 344.380(1). We recognize that Aker included other KCRA actions in his complaint, but they have all been summarily dismissed, and we declined review. So they bear no weight on our analysis today.

6. Under the KCRA it is unlawful to "retaliate or discriminate against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." *Id.*

7. *See Brooks v. Lexington–Fayette Urban County Housing Authority,* 132 S.W.3d 790, 801–802 (Ky.2004).

verse employment action.[8] Norton contends that Aker failed to make a prima facie retaliation claim against it under this standard, and that correspondingly, the Court of Appeals erred in reversing the trial court's summary judgment.

Norton offers a number of theories supporting reversal of the appellate panel majority's holding: (1) that the Court of Appeals erroneously invoked the futile-gesture doctrine to save Aker's action; (2) that the communication between Sherman and Powell was inadmissible under KRE 408; and (3) that, even if the statements are admissible, Aker failed to state a prima facie retaliation claim under the KCRA.

■■■ On summary-judgment review, the appropriate standard for our analysis is "whether the record, when examined in its entirety, shows there is 'no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." [9] The evidence must be viewed in favor of the nonmoving party with all ambiguities resolved in its favor.[10] In our review of the trial court's decision, we must "determine whether the trial court correctly found that there were no genuine issues of material fact." [11] Because there are no findings of fact involved, the trial court's grant of summary judgment is not entitled to deference on appeal.[12]

## A. The Court of Appeals Erroneously Invoked the Futile–Gesture Doctrine.

■■■ We have long endorsed a rule that "specific grounds not raised before the trial court, but raised for the first time on appeal will not support a favorable ruling on appeal." [13] When a trial court never has the opportunity to rule on a legal question presented to an appellate court, an appellant presents a different case to the appellate court than the one decided by the trial court.[14] Indeed, an appellate court is "without authority to review issues not raised in or decided by the ·trial court." [15] The proper role for an appellate court is to review for error—and there can be no error when the issue has not been presented to the trial court for decision.[16]

■■■ To rescue Aker's claim from the trial court's summary judgment, the Court of Appeals panel majority held that he was excused from proving he applied for a position with Norton. Under the futile-gesture doctrine, a potential employee's failure to apply for a position is not fatal to a retaliation claim when the employer fosters "an atmosphere in which employees understand that their applying for certain positions is fruitless." [17] This occurs "only

---

8. *Id.* at 803.

9. *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky.2010) (quoting CR 56.03).

10. *Id.*

11. *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009).

12. *Id. See also Schmidt v. Leppert*, 214 S.W.3d 309, 311 (Ky.2007).

13. *Fischer v. Fischer*, 348 S.W.3d 582, 588 (Ky.2011). *See also Springer v. Commonwealth*, 998 S.W.2d 439, 446 (Ky.1999) ("new theory of error cannot be raised for the first time on appeal").

14. *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976) (prohibiting appellant's "feed[ing] one can of worms to the trial judge and another to the appellate court").

15. *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky.2009).

16. *Fischer*, 348 S.W.3d at 589. *See also Turner v. Commonwealth*, 460 S.W.2d 345, 346 (Ky.1970).

17. *Wanger v. G.A. Gray, Co.*, 872 F.2d 142, 145 (6th Cir.1989). *See also International Bhd. Of Teamsters v. United States*, 431 U.S. 324, 366–68, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (a formal application is unnecessary

in the rare cases where an employer has essentially foreclosed the interactive process through its policies or explicit actions." [18] Essentially, the panel majority believed that Aker sufficiently established that filing a formal application would have been futile because of Powell's statement to Sherman—sufficiently established at least to survive Norton's motion for summary judgment. The panel majority considered Powell's statement an expression of Norton's intent to discourage Aker from applying for any position in the Norton system and relied on this legal theory in reversing the summary judgment entered against Aker.

In a vacuum, the panel majority might be correct to determine Aker could establish futility, thus saving his prima facie claim from summary judgment. But as the dissenting judge correctly identified, Aker never raised the issue of futility—it was never presented to the trial court, nor was it argued in briefing to the Court of Appeals. Instead, the futile-gesture doctrine was invoked sua sponte by the panel majority. This was an argument Aker never asserted and neither Norton nor the trial court had the opportunity to assess. And we will not find palpable error in this instance when the trial court was given no opportunity to err.

Aker attempts to salvage his favorable ruling in the Court of Appeals by contending that the futile-gesture doctrine was somehow subtly embedded in his original argument and by trying to pass the preservation misstep to Norton. Essentially, Aker posits that the futile-gesture doctrine was simply the panel's response to Norton's argument that he failed to show the

"adverse action" requirement through failure to submit an application—an argument Aker claims was also not presented to the trial court. Even if Aker is correct, it would make no difference. Norton is free to raise any argument it wishes *in support* of the trial court's summary judgment, including those not contested below.[19]

Simply put, Aker originally believed evidence of a general retaliatory motive would support his prima facie case. The futility argument failed to appear in the trial court proceedings, and Aker himself did not raise the issue to the Court of Appeals. Though a showing of futility is sufficient to satisfy the required element of his prima facie case, he bears the burden to preserve that issue for appellate review. Because he failed to meet this burden, we must conclude the Court of Appeals erred in invoking the futile-gesture doctrine sua sponte, and the panel's ruling on this issue is therefore vacated.

## B. KRE 408 Does Not Exclude Conversation Between Powell and Sherman.

 Before reviewing the trial court's grant of summary judgment for failure to state a prima facie retaliation claim, we must first address the admissibility of Powell's telephone conversation with Sherman—Aker's sole evidence of retaliatory motive. Norton alleges that the conversation should have been excluded from evidence. KRE 408 generally prohibits the admissibility of "conduct or statements made in compromise negotiations." This evidence is excluded primarily to support the Commonwealth's general policy of encouraging negotiation and settlement of

when individual establishes that filing an application would have been futile).

18. *Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 629 (10th Cir.1999).

19. *See Fischer,* 348 S.W.3d at 591 ("it is ... the rule in this jurisdiction that the judgment of a lower court can be *affirmed* for any reason in the record."). *See also Dean v. Commonwealth Bank & Trust,* 434 S.W.3d 489, 496 (Ky.2014).

disputes out of court. So the threshold question we must answer is whether the conversation between Powell and Sherman falls within the scope of KRE 408 protections.

There are three types of evidence excluded by KRE 408: (1) offers to compromise disputes; (2) settlements of disputes; and (3) statements of fact made or conduct occurring during the course of settlement negotiations.[20] There are also two basic requirements prerequisite to any invocation of the KRE 408 rule of exclusion. First, the rule requires the existence of a dispute as to the validity or amount of a specific claim.[21] Second, the rule requires an effort to settle the dispute by agreement to avoid extending the rule of exclusion to casual conversation or statements made for some other purpose than settlement.[22]

The first requirement would appear firmly in place in this case—at the time of Powell's statement, Aker had already filed his original pro se complaint against Norton. But Aker disputes this characterization because the Powell–Sherman phone call did not involve *this claim* in particular. Instead, Aker theorizes that the conversation relates back to his original pro se action against Norton. And this is supported by his belief that this conversation itself gives rise to this separate cause of action. So his argument is that this action did not exist at the time the conversation occurred, and therefore, could not possibly constitute compromise negotiations in the claim. But we think this approach is short-sighted and undermines the specific policy goals KRE 408 was designed to reflect.

We see no reason to make exception for new claims arising out of settlement talks in a separate claim. To us, it would impair our stated policy of encouraging compromise and fostering open conversation between parties to endorse Aker's theory. To be sure, the chilling effect on compromise negotiations that KRE 408 was designed to curb would remain in full force should we allow the contents of those discussions to form the basis for a new action. Even more so in this case where the alleged retaliation is simply refusing to accept the terms offered by Aker's attorney, an exception to allow new claims from discussions between parties becomes increasingly absurd. In this event, under Aker's theory, Norton would be better off refusing to treat with Aker at all rather than risking another action simply by picking up the phone. We cannot accept this approach to KRE 408 for separate claims arising from negotiations themselves.

But the second requirement was the fatal stroke against Norton's evidentiary argument. The Court of Appeals panel concluded that the Powell–Sherman exchange were not efforts to compromise under KRE 408. Rather, the court characterized the conversation as a declaration of Norton's "unwillingness to consider compromise or settlement." But to be sure, Powell bluntly refused to re-hire Aker, allegedly because he filed suit, even if Aker agreed to drop his suit against the employer.[23] It seems to us that the Court of

20. *See* KRE 408. *See also* Lawson, The Kentucky Evidence Law Handbook, § 2.55(1)(a) (LexisNexis Matthew Bender). This need not be a filed complaint, but that certainly satisfies this requirement. *See id.*

21. *See* Lawson, § 2.55(1)(b).

22. *Id.*

23. Norton disputes the contents of the conversation, and whether or not Powell's expression that Norton was not interested in future employment for Aker after filing his pro se suit ever occurred. But viewing the facts in favor of the party opposing summary judg-

Appeals refused to consider this a compromise negotiation simply because Norton refused the proposition. Indeed, it would appear that if Norton had acquiesced to Sherman's terms, no one would take issue with labeling the agreement as a "settlement" or "compromise."

But ultimately, we must hesitantly agree that KRE 408 does not apply to this conversation. Although we reject the notion that this individual retaliation claim renders the rule inapplicable and we disagree with characterizing the conversation as Norton's "unwillingness to consider compromise," we think Sherman did not intend to negotiate with Norton when he spoke over the telephone with Powell. Instead, we think Sherman was merely verbalizing Aker's demands to Norton—which does not fall under the KRE 408 protection.[24] The purpose of Sherman's phone call to Powell was not to engage in the negotiation process, but to apprise Norton of Aker's demands— essentially just informing Norton of the price it would have to pay for Aker to drop his lawsuit. So we hold that KRE 408 does not bar introduction of the Powell–Sherman conversation.

## C. Aker Failed to Establish A Prima Facie Retaliation Case.

Turning to Aker's substantive claim, the trial court granted Norton summary judgment because it concluded that Aker failed to establish a prima facie case for post-termination retaliation. Specifically, Norton contends that Aker failed to establish an "adverse employment action" taken against him. Because Aker offers nothing beyond a general discriminatory motive, he failed to establish a prima facie claim.

### 1. There was no adverse employment action taken against Aker.

 Though it does not perfectly reflect the complex employment relationship between Norton and Aker, we think the failure-to-hire doctrine adequately addresses the adverse action issue. In a sense, this issue could most aptly be labeled a failure to re-hire. But because re-hiring an employee is essentially the same action as hiring an applicant, we think the failure-to-hire test sufficiently covers the issues in this case.

 To raise a prima facie failure-to-hire case, one must show: (1) an available position for which the plaintiff was qualified; (2) that the plaintiff applied for the position or the employer was otherwise obligated to consider him; and (3) that the position went to someone outside the protected class.[25] Because Aker failed to apply for any position with Norton after the telephone exchange between Powell and Sherman, Norton argues that he cannot possibly establish the adverse action requirement. And because Aker had been terminated from his position with Norton for months, he cannot point to any material change in the terms or conditions of his employment relationship with Norton because of Powell's comments to Sherman. As the United States Supreme Court held in Burlington *Northern & Santa Fe Ry. v. White,* "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from

---

ment (Aker), we must accept his version of the conversation.

**24.** *See Kraemer v. Franklin & Marshall College,* 909 F.Supp. 267 (E.D.Pa.1995) (letters requesting faculty appointment not an offer to

settle, but a demand under threat of legal action).

**25.** *See Wanger v. G.A. Gray Co.,* 872 F.2d 142 (6th Cir. 1989).

making or supporting a charge."[26] Under this fact-specific standard, Aker failed to meet this burden.

But Aker points to a more expansive understanding of an adverse employment action qualification established in *Wanger v. G.A. Gray Co.*[27] *Wanger* supplemented the traditional *McDonnell Douglas* test[28], allowing a plaintiff to establish an adverse-action claim by proving either: (1) the plaintiff submitted a formal application for a job opening; (2) by establishing the employer was "otherwise obligated" to consider the plaintiff for employment; (3) establishing the employer's continuing desire to be hired; or (4) proving that submitting an application would have been a "futile gesture."[29] Aker does not dispute that he never submitted a formal application for a position after the alleged retaliatory statement occurred. And for reasons established above, the futile-gesture doctrine is inapplicable to our analysis. So under Aker's proffered test, he must either establish that Norton was "otherwise obligated" to hire him or that he adequately gave Norton notice of his continued desire for employment after filing his lawsuit.

Aker devoted a great deal of time briefing us about Norton's "obligation" to consider him for employment. This primarily centralizes around his misunderstanding that he had a contractual right to reinstatement as part of the Grievance Team's plan amending his original Level I offense. But this ignores the law of the case before us today. The Court of Appeals affirmed the trial court's summary judgment that Aker had no contractual right to reinstatement, and we declined to review that issue. So in the eyes of this Court, Aker's employment relationship with Norton at the time this claim arose was completely severed, and we have no interest in subtly relitigating that issue as part of this analysis. Viewing Aker's employment status in this light, Norton was in no way "obligated" to consider him for employment simply because he previously filed a lawsuit.

Aker further contends that Norton was aware of his continued interest in employment and even invited him to apply for positions. This is supported by a letter sent to Aker from Powell dated January 11, 2008, inviting Aker to contact him if he was still interested in employment with Norton. But this predates Aker's pro se complaint, which was filed February 27, 2008. Powell's letter simply informed Aker that he was officially terminated as a Norton employee. This does not obligate Norton to hire Aker, nor does it represent Norton's intent or willingness to consider him for a position in the future.

Most importantly, as Norton correctly informs us, even if we were to excuse Aker's failure to apply, he is not excused from identifying a position he *would have applied for*. We have no doubt that Norton likely has an abundance of low-level positions open at a given time—and we think this assumption motivated the Court of Appeals ruling on the adverse-action requirement—but it is Aker's duty to specify a particular vacancy, or something more than simply desiring a job with Norton. Even if we would be willing to ignore Aker's failure to apply for a position with Norton, we cannot avoid his failure to name any particular position for which he would have sought employment. We are powerless to remedy Aker's situation if

26. 548 U.S. 53, 67–68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

27. *Id.*

28. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

29. *Wanger*, 872 F.2d at 145–46.

there is no identifiable job he failed to obtain, even if Norton expressed a discriminatory motive in retaliation.

In sum, Aker failed to establish a prima facie retaliation case under the KCRA because he failed to prove any adverse employment action taken against him. At the time he filed his suit, he was no longer a Norton employee; there was no employment relationship between the two parties when Powell expressed Norton's disinterest in re-hiring him. So there could be no material change in his employment status as a result of Powell's statement. He failed to identify a single position he sought with Norton after the conversation—let alone evidence of any application for a position as an external candidate. Given the facts before us, we must conclude that Aker failed to establish a prima facie case. We must therefore reinstate the trial court's summary judgment in favor of Norton.

### III. CONCLUSION.

For the foregoing reasons, the decision of the Court of Appeals reversing summary judgment is reversed, and the trial court's summary judgment is reinstated.

All sitting. Minton, C.J., Cunningham, Hughes, Noble, Venters, Wright, JJ., concur. Keller, J., concurs in result only